## UNITED STATES v. BREESE.

### (District Court, W. D. North Carolina. July, 1904.)

**1. NATIONAL BANKS—EMBEZZLEMENT BY OFFICERS OR AGENTS—ELEMENTS OF OFFENSE.**

The crime of embezzlement from a national bank by an officer, clerk, or agent, within Rev. St. § 5209 [U. S. Comp. St. 1901, p. 3497], involves two general elements: First, a breach of trust or duty with respect to the moneys, funds, or credits of the bank embezzled, which must have been lawfully in the custody or possession of the accused by virtue of his office or employment, although such possession need not have been exclusive of that of other officers, clerks, or agents; and, second, the wrongful appropriation of such moneys, funds, or credits to his own use, with intent to injure or defraud the association or others.

**2. SAME—ABSTRACTION BY OFFICER OR AGENT.**

Abstraction, under Rev. St. § 5209 [U. S. Comp. St. 1901, p. 3497], is the act of one who, being an officer, clerk, or agent of a national banking association, wrongfully takes or withdraws from it any of its moneys, funds, or credits, with intent to injure or defraud it, or some other person or company, and, without its knowledge and consent, or that of its board of directors, converts them to the use of himself, or of some person or company other than the bank. No previous lawful possession is necessary to constitute the crime, nor does it matter in what manner it is accomplished.

**3. SAME—MISAPPLICATION OF FUNDS BY OFFICER OR AGENT.**

Willful misapplication of the moneys, funds, or credits of a national bank, within Rev. St. § 5209 [U. S. Comp. St. 1901, p. 3497], consists in their misapplication by an officer, clerk, or agent of the bank, made willfully and wrongfully, and with intent to injure or defraud the association or some other person or company, and their conversion to his own use, or to the use of some one other than the bank. No previous lawful possession is necessary to constitute the crime.

**4. SAME—OFFENSES INCLUDED IN EMBEZZLEMENT.**

The crime of embezzlement by an officer, clerk, or agent of a national bank, under Rev. St. § 5209 [U. S. Comp. St. 1901, p. 3497], necessarily includes the offenses of abstraction and willful misappropriation, but either of the latter offenses may be committed without embezzlement.

**5. SAME—INTENT TO INJURE OR DEFRAUD.**

The intent to injure or defraud, made by Rev. St. § 5209 [U. S. Comp. St. 1901, p. 3497], an element of the offenses of embezzlement, abstraction, or willful misapplication of funds by an officer, clerk, or agent of a national bank, need not necessarily have been the object or purpose with which the act was done; but it is sufficient if the natural and necessary effect of the act was to injure or defraud the bank or others, and it was willfully and intentionally done.

**6. CRIMINAL LAW—BURDEN AND SUFFICIENCY OF PROOF.**

While the burden of proof rests upon the prosecution in a criminal case from the beginning to the end of the trial, it is successfully met whenever, from all the evidence introduced in the case, and taking into consideration the presumption of innocence in favor of the accused, the jury are satisfied of his guilt beyond a reasonable doubt.

**7. SAME—EVIDENCE OF INTENT—OTHER TRANSACTIONS.**

On the trial of an officer of a national bank for embezzlement, abstraction, and misapplication of funds, under Rev. St. § 5209 [U. S. Comp. St.

1901, p. 3497], which makes an intent to injure or defraud an element of either offense, evidence of other transactions by defendant of similar character is admissible, but may be considered by the jury only on the question of the knowledge and intent of the accused when he committed the acts charged in the indictment.

8. NATIONAL BANKS—EMBEZZLEMENT BY OFFICER—DEFENSES.

An officer of a national bank is not guilty of embezzlement, abstraction, or willful misapplication of its funds because of his obtaining money from the bank for his own use by means of overdrafts or loans by bona fide arrangement with its authorized officers or committee, but he is only protected by such arrangement where it was made by those representing the bank in good faith, and in the supposed interest of the bank.

9. CRIMINAL LAW—EVIDENCE OF GOOD CHARACTER.

The good character of a defendant, proved in a criminal case, is evidence in his favor, which goes to strengthen the presumption of his innocence.

Indictment under Rev. St. § 5209 [U. S. Comp. St. 1901, p. 3497]. On charge to the jury. )

See 106 Fed. 680, 45 C. C. A. 535; 108 Fed. 804, 48 C. C. A. 36.

The defendant, William E. Breese, was president and director of the First National Bank of Asheville, N. C., and was indicted for violation of section 5209, Rev. St. The indictment contained 66 counts, and charged the defendant with embezzlement, abstraction, and willful misapplication of the moneys, funds, and credits of the bank. Defendant was found guilty of abstraction and willful misapplication.

A. E. Holton, U. S. Atty., and A. H. Price, Asst. U. S. Atty.

H. C. Jones, F. I. Osborne, J. S. Adams, Thos. S. Rollins, and Chas. A. Moore, for defendant.

KELLER, District Judge (orally charging jury). Gentlemen of the jury, when I assumed the position that I now hold, I took upon myself a solemn obligation to the effect that I would administer justice without respect to persons, and do equal right to the poor and to the rich, and that I would faithfully and impartially discharge all the duties incumbent upon me, according to the best of my ability and understanding, agreeably to the Constitution and laws of the United States. It is with a reverent spirit, and with the idea of fulfilling that obligation to the best of my ability, that I approach this last and most important duty of mine in connection with this long and important trial. The time is fast approaching when you, too, will be called upon to discharge the last and most important duty that you have in regard to this trial.

The office of the jury is an ancient, honorable, and highly important one. To it is committed the sole and final judgment of the facts of the case. This is no idle fiction of law, and I desire to emphasize the point that you, gentlemen, are the sole judges of the facts; and, while I shall not intentionally intimate any opinion whatever upon any disputed matter of fact in this case, yet, if I should inadvertently do so, I desire that it shall not influence your action in the slightest degree. You are sworn to well and truly try the defendant, and a true verdict render according to the evidence, and the tenor of the oath indicates the

¶ 9. See Criminal Law, vol. 14, Cent. Dig. § 840.

frame of mind in which you should approach your duties. No prior impressions, no public clamor against the defendant, no pity or sympathy for him, or for those whom his acts may be alleged to have injured, should for one moment have place in your minds; but calmly, dispassionately, as citizens of the United States, discharging a most solemn duty of citizenship, sworn to render a true verdict, you should examine and weigh the evidence in this case in the light of the instructions given you as to the law in this charge, and let your lips utter the verdict that your honest thought inspires.

As I have said, gentlemen, I am sworn to discharge my duty according to the best of my abilities, and shall give you in this charge the law applicable to this case, as I understand it; and it is your duty to receive it as the law of the case, and to apply it to the facts as you believe them to be.

It is the ordinary practice, and is perhaps wise, that the last word to the jury should be from the court. Counsel, in the earnestness of endeavor to serve well their clients, press their respective contentions, enforced by passionate appeal and ingenious argument; and, while it is right and proper for the jury to consider and weigh these arguments of counsel, in so far as they are based on the evidence, yet a last, dispassionate statement of the considerations of law which must guide the jury in their determination of their judgment upon the facts of the case seems wise and right. And at this juncture I take occasion to say that counsel on both sides of the case, first for the defendant, and then for the government, referred in their arguments to matters connected with the former trials of this case. I desire to withdraw these remarks from the consideration of the jury, and to say to you that you are trying this case and are to try it just as if it were being heard for the first time, and any considerations of former trials are not before you, and are not to be considered by you.

Before adverting at all to the indictment in this case, I desire to call your attention to one or two general and fundamental rules of law which are applicable to all cases where a brother man is tried for the commission of a criminal offense:

First. Under the law of our land, every person accused of crime is presumed to be innocent; and I instruct you in this case that the defendant is presumed to be innocent of the charges in the indictment, and that this presumption continues in his favor throughout the trial, the same as though it had been testified to as a matter of evidence, and it can only be overcome by evidence which satisfies you beyond a reasonable doubt of the defendant's guilt.

Second. The burden of proof is on the government to satisfy your minds, by legal and competent evidence, "beyond a reasonable doubt," of the guilt of the defendant upon one or more of the offenses charged in the indictment; and the evidence in the case must be so conclusive that, taking it all together, it cannot be reasonably reconciled with the theory of the defendant's innocence.

A reasonable doubt is an honest, substantial doubt, actually existing in your minds, and arising either from evidence favorable to the defendant, or from a want of evidence on behalf of the government. It is not merely such a doubt as may be conjured up in the mind of

one desirous of escaping the responsibility of decision, or such as may be engendered by pity or sympathy for the accused.

The indictment in this case is drawn under the provisions of section 5209 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3497], which reads as follows:

"Every president, director, cashier, teller, clerk or agent of any association, who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of the association; or who, without authority from the directors, issues or puts in circulation any of the notes of the association, or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment or decree, or who makes any false entry in any book, report or statement of the association, with intent, in either case, to injure or defraud the association, or any other company, body politic or corporate or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association; and every person who with like intent aids or abets any officer, clerk or agent in any violation of this section, shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten."

There are, as you will observe, a number of distinct offenses enumerated in this section, but in the indictment in this case only three of these have been charged against the defendant, William E. Breese. The defendant is charged with having (1) embezzled, (2) abstracted, and (3) willfully misapplied moneys, funds, and credits of the First National Bank of Asheville, with intent to injure and defraud the association and other persons to the grand jurors unknown. The indictment contains sixty-six counts, founded upon twenty-two separate transactions, each of which has been made the subject of three separate counts—one for embezzlement, one for abstraction, and one for willful misapplication of the moneys, funds, or credits of the bank. Thus the first count charges the defendant, as president of the bank, with having on January 7, 1897, embezzled the sum of $351 of the moneys, funds, and credits of the bank, and converted the same to his own use, with intent to injure and defraud the First National Bank of Asheville, and other persons to the jurors unknown. The second count charges the abstraction of the same amount on the same day by means of a check drawn by the defendant on the First National Bank of Asheville to the order of "Cash Memo." The third count charges the willful misapplication of the same amount on the same day, and by the same means. I have kept a memorandum of the charges made in the counts, and, if I have it correct, the remaining counts are, in substance, as follows: The 4th, 5th, and 6th counts are based upon a check for $100 drawn to the order of W. H. Westall, and dated January 7, 1897. The 7th, 8th, and 9th counts, upon a check drawn to the order of "Cash Memo.," dated January 21, 1897. The 10th, 11th, and 12th upon a check for $156 drawn to the order of Robt. U. Garrett, and dated January 21, 1897. The 13th, 14th, and 15th, upon a check for $25 drawn to the order of "Cash," and dated February 9, 1897. The 16th, 17th, and 18th, upon a check for $44.50 drawn to the order of_Thomas Lawrence, and dated February 11, 1897. The 19th, 20th, and 21st, upon a check for $50 drawn to the order of "Self," and dated February 18, 1897. The 22d, 23d, and 24th upon a check for $100 drawn to the order of "Self," and dated

February 22, 1897. The 25th, 26th, and 27th upon a check for $169.84 drawn to the order of "Cash Memo.," and dated March 9, 1897. The 28th, 29th, and 30th upon a check for $68 drawn to the order of "J. D. Church, General Agent," and dated March 4, 1897. The 31st, 32d, and 33d, upon a check for $680.15 drawn to the order of "W. H. Penland, Cashier," and dated March 24, 1897. The 34th, 35th, and 36th, upon a check for $100 drawn to the order of "Mrs. M. A. E. W.," and dated April 7, 1897. The 37th, 38th, and 39th, upon a check for $176.19; and my memorandum does not state in whose favor it was drawn, but the fact that it was in full or part payment of Veorhoff's draft, and dated May 7, 1897. The 40th, 41st, and 42d, upon a check for $111, Mrs. Anna R. Cartmell, dated May 27, 1894. The 43d, 44th, and 45th, upon a check for $135.21 drawn to the order of Nordyke, Norman & Co., and dated May 21, 1897. The 46th, 47th, and 48th counts are out of the indictment. No evidence was offered in support of these counts. The 49th, 50th, and 51st are based upon a check for $74.39 payable to the order of Powell & Snyder, and dated June 10, 1897. The 52d, 53d and 54th, upon a similar check for $74.38, payable to the order of Powell & Snyder, and dated June 19, 1897. The 55th, 56th, and 57th, upon a check for $48.25, payable to the order of the Fulton Bag Company, and dated June 21, 1897. The 58th, 59th, and 60th, upon a check for $102.43, payable to the order of Nordyke, Norman & Co., and dated June 21, 1897. The 61st, 62d, and 63d, upon a check for $94.45—my memorandum does not show to whom it was made payable, but I think to the New York Life Insurance Company—upon a draft dated July 13, 1897. The 64th, 65th, and 66th, upon a check for $349.80, dated July 21, 1897, and drawn for the purpose of paying the draft of Veorhoff & Co.

The first charge in the indictment, gentlemen, is that of embezzlement. This word, as used in the statute, has a technical meaning, and is a species of larceny. I will endeavor to explain this technical meaning to you, in order that you may be the better enabled, when you go to your room, to determine whether the proof before you brings the acts of the defendant charged in the first count of the indictment, and in every third count thereafter, or any of them, within the scope of that definition; and, for this purpose, I cannot do better than to quote with approval the words of another federal judge (the late Mr. Justice Howell E. Jackson) in charging a jury in a similar case. United States v. Harper (C. C.) 33 Fed. 474–476. I now quote:

"It [the crime of embezzlement] is especially applicable to the unlawful conversion of property by clerks, agents, and servants acting in fiduciary or trust capacities, and, under the statute above quoted, by a president, director, cashier, teller, clerk, or agent of any national banking association. It involves two general ingredients or elements: First, a breach of trust or duty in respect to the moneys, properties, and effects in the party's possession, belonging to another; and, secondly, the wrongful appropriation thereof to his own use. In order to constitute this crime, it is necessary that the property, money, or effects embezzled should have previously come lawfully into the hands, possession, or custody of the party charged with such offense, and that while so in his possession and custody, held for the use and benefit of the real owner, he wrongfully converted the same to his own use. In other words, there must be an actual and lawful possession or custody of the property of another, by virtue of some trust, duty, agency, or employment, committed to the party

charged, and, while so lawfully in the possession and custody of such property, the person must unlawfully and wrongfully convert the same to his own use, in order to commit the crime of embezzlement. The difference between the crime of embezzlement and that of larceny may serve to better illustrate what is required to constitute the former offense. In larceny there is the ingredient of an unlawful taking from the possession of the owner with the intent to deprive him of his property, and to wrongfully appropriate the same to the use of the party so taking. The custody or actual possession in larceny is acquired by the party unlawfully, in the act of feloniously taking the owner's property without his consent. But in embezzlement there is no wrongful or unlawful acquisition of the custody or possession of the property embezzled. On the contrary, the party embezzling must be lawfully in possession, by virtue of some employment, trust, or agency, under and with the consent of the owner, and while so in possession, holding the property in trust, or for the benefit of the owner, he wrongfully converts the same to his own use. A few practical illustrations may serve better to explain the offense of embezzlement. If your clerk—a clerk in your store—within the line of his employment, sells your goods to a customer, and receives the price therefor, and, while holding the money thus received, even on his way to deposit it in the cash drawer or to deliver it to his employer, he converts it to his own use, or any portion thereof, this would constitute embezzlement. Now, if, after having received the money from a customer, the clerk should deliver it over to his employer, or cashier authorized to receive it for him, and should thereafter secretly take the same identical money from the employer's pocket or the cashier's drawer, with the intent to appropriate it to his own use, that would be larceny. You send your hired man to the city or depot with a load of corn. The property is yours, but it is lawfully for the time being in the possession of the hired man as your agent, to hold and deliver for you, for your use and benefit, according to your directions. Instead of executing his duty, he converts or appropriates all or any portion of the corn to his own use. This would be embezzlement. If he should surreptitiously take from your crib corn, with the possession of which he had not been previously intrusted, his offense would be larceny. If the general bookkeeper of a bank, having no general or special custody or possession of the funds of the bank, secretly takes from the safe or drawer of the receiving or paying teller moneys of the bank, with the intent to appropriate the same to his own use, he commits an act of larceny. If, however, the teller—receiving or paying teller—in whose custody the moneys of the bank are placed by virtue of his employment or duty takes the same amount from his drawer, and converts the same to his own use, he would commit the crime of embezzlement. These instances will serve to illustrate the principle which you should keep in mind and apply in considering the charge of embezzlement against the defendant. It must appear from the evidence that the moneys, funds, credits, or assets of the association, alleged to have been embezzled, were, previously to their wrongful appropriation, lawfully in the possession and custody of the defendant, and that they were, while so held by him, wrongfully converted to his own use. It is not, however, necessary that he should have been in the exclusive custody or possession at the time of the conversion to his own use, in order to constitute this offense. If the evidence establishes that the business and assets of the bank were actually or practically intrusted to the care and management of the defendant, so that, by virtue of his position as vice president, director, or agent, he had not merely access to, or a constructive holding of, but such actual custody of the funds, moneys, and credits of the association as enabled him to have and exercise control over the same, that would place him in the lawful possession of said funds or other property; and if, while so lawfully in possession of such assets, funds, and credits, or other property, committed to his care and custody for the benefit of the bank, he wrongfully converts any part or portion of said assets to his own use, with intent to injure or defraud the association, he would thereby commit the offense of embezzlement. If his position and employment gave the defendant a superior or a joint and concurrent possession with subordinate employés or agents of the bank, that would be sufficient to place him in such lawful possession as would enable him to commit the crime of embezzlement, in relation to assets of the bank so committed to his keeping. If, for example, his position and employment in

the bank gave the defendant a joint or concurrent possession and custody of the bank's moneys, funds, and credits with the teller, cashier, or other officer, this would constitute lawful possession on his part for the benefit of the association, equal with that of such teller, cashier, or agent; and if, while so lawfully in possession, either alone or jointly with other officers or agents of the bank, he wrongfully converts said funds or assets to his own use, with intent to injure or defraud the association, he would thereby commit the offense of embezzlement."

So far I have quoted.

You are not required to find that the exact sum or sums stated in these counts in the indictment was or were embezzled. If, under the circumstances mentioned, any portion of the funds described in the counts was embezzled, no matter how small the amount may be, it will be sufficient to sustain a verdict, and you are not required to specify in your verdict the amount embezzled.

We next come to the charge of abstraction. This has no such technical and limited meaning as has the word "embezzlement." To "abstract" means to take from or to withdraw from, so that to abstract the moneys, funds, or credits of the bank, or a portion of them, is to take or withdraw from the possession and control of the bank such moneys, funds, or credits. To constitute the offense, within the meaning of the act, it is necessary that the moneys, funds, or credits should be abstracted from the bank without its knowledge and consent, and with intent to injure or defraud it, or some company or person other than the bank. Abstraction, under section 5209, Rev. St. [U. S. Comp. St. 1901, p. 3497], is the act of one who, being an officer of a national banking association, wrongfully takes or withdraws from it any of its moneys, funds, or credits, with intent to injure or defraud it, or some other person or company, and, without its knowledge and consent, or that of its board of directors, converts them to the use of himself, or of some person or company other than the bank. No previous lawful possession is necessary to constitute the crime, nor does it matter in what manner it is accomplished. It may be done by one act, or by a succession of acts. It may be done under color of loans, discounts, checks, and the like. The means used do not change the nature of the act. If the necessary or natural result is to wrongfully withdraw funds or moneys of the bank, without its actual knowledge and consent, by its board of directors, and to convert the same to the use and benefit of the abstractor, or to that of some person or company other than the bank, the means resorted to are of no consequence, and in no way affect its criminal nature.

"Willful misapplication," as described in the statute, means a misapplication, willfully and unlawfully made by one of the officers enumerated therein, of the moneys, funds, or credits of the bank, and made with intent to injure the bank, or some other company or person; and it has been held that there must be a conversion of the funds misapplied, to the use and benefit of the wrongdoer, or to the use of some one other than the bank. It is not necessary that the officer so charged should have been previously in the possession or custody of the money, funds, or credits of the bank by virtue of any trust, duty, or employment.

You will thus see that an officer of a bank cannot be guilty of embezzlement unless the moneys, funds, or credits of the bank have first

been placed lawfully in his custody and control, to be held and used in trust for the bank; but he may be guilty of abstracting or misapplying them without having been lawfully intrusted with their custody. Similarly, to constitute the crime of embezzlement, the thing embezzled must be converted to the use of the criminal, while the moneys, funds, or credits of a bank may be criminally abstracted or willfully misapplied, whether used by the criminal for his own benefit, or for that of any person other than the bank.

It thus appears that whenever the crime of embezzlement, under section 5209, is committed, it embraces as well the offenses of abstraction and willful misapplication, but the converse of the proposition is not necessarily true. That is, as to any transaction which is made the subject of an indictment under this section, if the defendant is proved guilty of embezzlement, he is also necessarily guilty of abstraction and willful misapplication, because every essential feature of the latter crimes is included in the essentials to constitute embezzlement; but he may be found guilty of abstraction or of willful misapplication, or both, without being necessarily guilty of embezzlement as to the transaction which is the subject of the charge. You will notice that, in each of these offenses, intent to injure or defraud the bank, or some other person or company, is an essential element; and, unless the jury are satisfied beyond a reasonable doubt that this intent to injure existed at the time of the commission of one or more of the acts charged in the indictment, they cannot convict the defendant.

It becomes important, then, to ascertain what is meant, in law, by this intent to injure or defraud, and what is necessary to establish it. Ordinarily the intent with which a man does a criminal act is not proclaimed by him. Ordinarily there is no direct evidence by which a jury may be satisfied from the declarations of the criminal himself as to what he intended when he did a certain act. The statute does not mean that it must be made to appear to the jury by proof which convinces their minds beyond a reasonable doubt that the defendant had malice or ill will towards the bank, or that he intended to wreck it. The intent to injure or defraud contemplated by the statute is not inconsistent with a deep and abiding interest on the part of the accused in the prosperity of the bank, and a sincere desire for its ultimate success and welfare. I say intent to defraud is not inconsistent with that state of affairs. If a man knows that the act he is about to commit will naturally or necessarily have the effect of injuring or defrauding another, and he voluntarily and intentionally does the act, he is chargeable, in law, with the intent to injure or defraud. It is not necessary that his object or purpose was primarily to injure or defraud. It may have been to benefit himself. These terms, as used in the statute, mean nothing more than that general intent to injure or defraud which always arises, in contemplation of law, when one willfully or intentionally does that which is illegal or fraudulent, and which, in its necessary and natural consequence, must injure another. The law presumes that every man intends the natural and ordinary consequences of his acts. Wrongful acts knowingly or intentionally committed cannot be justified on the ground of innocent in-

tent. The color of the act, done with knowledge of its natural or necessary results, determines the complexion of the intent.

This question of intent, like all other questions of fact, is solely for the jury to determine, but it must be determined by you in this case in accordance with these legal principles; and I therefore instruct you that if, from all the evidence in the case, you should believe beyond a reasonable doubt that any one or more of the acts charged against the defendant was or were committed by him at the time and in the manner charged in the indictment, and that he committed such acts voluntarily and intentionally, and with full knowledge that the natural and necessary result thereof would be to injure or defraud the bank or some other company or person, then you must necessarily infer, as to such act or acts, that they were committed with the intent to injure or defraud mentioned in the statute; and unless, from the presumption of innocence existing in favor of the defendant raised by the law, or from evidence introduced in his behalf, there exists in your minds a reasonable doubt of such intent, you should find him guilty as to the count or counts embodying such act or acts.

Strictly speaking, the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence, or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial and applies to every element necessary to constitute the crime. But this burden is successfully borne whenever, from all the evidence introduced in the case, and taking into consideration the legal presumption which the law indulges in favor of the innocence of the accused, you have no reasonable doubt of his guilt. If the whole evidence, when carefully examined, weighed, and compared, produces in your minds a settled conviction or belief of the defendant's guilt—such a conviction as you would be willing to act upon in the most important matters relating to your own affairs—you are free from any reasonable doubt, and should find a verdict in accordance with that conviction or belief.

I desire to direct your attention for a moment to the distinction between the presumption of innocence raised by the law in favor of the defendant and reasonable doubt. In the words of the Supreme Court of the United States (Coffin v. United States, 156 U. S. 459, 460, 15 Sup. Ct. 394, 39 L. Ed. 481):

"The presumption of innocence is a conclusion drawn by the law in favor of the citizen, by virtue whereof, when brought to trial upon a criminal charge, he must be acquitted unless he is proven to be guilty. In other words, this presumption is an instrument of proof created by the law in favor of one accused, whereby his innocence is established until sufficient evidence is introduced to overcome the proof which the law has created. This presumption on the one hand, supplemented by any other evidence he may adduce, and the evidence against him, on the other hand, constitute the elements from which the legal conclusion of guilt or innocence is to be drawn."

Thus far I quote.

Reasonable doubt, you will observe, is the result of the proof, and not the proof itself, and must arise, if, in fact, it exists in your

minds, from the presumption of innocence alone, or in connection with other evidence favorable to the accused, and it must exist after weighing all the evidence in the case, in order to justify a finding based upon it. In other words, if, after weighing all the evidence on both sides, including the legal presumption of which I have spoken, you are convinced of the guilt of the accused, it is your duty to so find by your verdict.

Certain evidence has been introduced by the prosecution as to transactions by the defendant other than those made the subject of the several counts in the indictment. I stated to you at the beginning of the introduction of this testimony and evidence that it was only admissible for the purpose of affording light to the jury as to the knowledge, motive, or intent of the defendant in the commission of the acts with which he is charged in the indictment. I reiterate that statement now. It is a rule of law especially applicable to cases like the present, wherein the intent of the defendant is an essential element of the offense charged, that evidence of other acts done, tending to show knowledge, motive, or intent, is admissible, even if it involves other offenses than those charged in the indictment; but such evidence is only competent for the purpose of showing such knowledge, motive, or intent, and the jury must be careful not to confound the evidence given as to these matters with that bearing directly upon the charges in the indictment. For, even if you believe the defendant guilty of wrongdoing connected with these transactions not embraced in the indictment, about which the witnesses have been permitted to testify, you cannot convict him on account of such wrongdoing; but you may consider this evidence so far, and so far only, as it may aid you in arriving at the knowledge of the defendant of his own financial condition and that of the bank at and before the time of the acts charged in the indictment, and in so far as it may aid you in determining the motive and intent influencing the defendant in doing the acts charged in the indictment, if you find that he did such acts. Indeed, the Supreme Court of the United States has said, referring to a similar case (Wood v. United States, 16 Pet. 342, 10 L. Ed. 987):

"The question was one of fraudulent intent, or not, and upon questions of that sort, where the intent of the party is matter in issue, it has always been deemed allowable, as well in criminal as in civil cases, to introduce evidence of other acts and doings of a party of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment. Indeed, in no other way would it be practicable in many cases to establish such intent or motive, for the single act, taken by itself, may not be decisive either way; but, taken in connection with others of a like character and nature, the intent and motive may be demonstrated almost with conclusive certainty. They constitute exceptions to the general rule excluding evidence not directly comprehended within the issue, or rather, perhaps, it may with some certainty be said, the exception is necessarily embodied in the very substance of the rule, for whatever does legally conduce to establish the point in issue is necessarily embraced in it, and therefore the proper subject of proof, whether it be direct or only presumptive."

Special prayers for instructions to the number of 63 have been presented by the defendant. Of these, many have been embodied

substantially in the charge as given. I give you the following additional ones: Here is one that refers to the matter about which I have been speaking (No. 20):

"Although the jury may believe that the defendant is guilty of other offenses and violations of the law than those charged against him, and that such other transactions about which the witnesses have been permitted to testify constitute such offenses, the jury cannot convict the defendant upon this bill of indictment of the same; and the jury should therefore be careful not to confound the defendant's acts and doings which appear in the evidence detailed as to other transactions than those charged in the bill of indictment with those acts charged in the bill, for, though the jury may believe the defendant guilty of violations of the law other than that charged in the bill of indictment, they would not be justified in finding him guilty in this case for such violations, and the jury is instructed to put out of consideration all the evidence of other transactions and doings of the defendant, no matter how wrongful and unlawful the same may appear to them to be, unless such transactions and doings tend to show the wrongful intent of the defendant in doing the acts charged in the bill of indictment."

I give you that with the added clause, of course, that these matters and things testified about are also competent for the purpose of showing knowledge, if they do tend to show knowledge, of the condition of the defendant's affairs and those of the bank.

I am asked in No. 21 to instruct you that:

"A president of a national bank is not guilty, under the statute, for merely obtaining money from the bank of which he is such president by means of overdrafts made by him upon the bank. He has the same legal right to deal with the bank and to borrow money from it as any other individual; and in this case, if the defendant overdrew his account in the bank, or borrowed money from the bank, under any honest or bona fide arrangement or agreement with the bank or its duly authorized officers and committees, he would not be guilty of embezzlement, as charged, on that account."

And I am asked substantially to give you the same charge with respect to the offense of abstraction and willful misapplication in Nos. 23 and 28. I accordingly give you this charge, but with the explanation that such arrangement or agreement with the bank, or its duly authorized officers and committees, must be a bona fide exercise of their official discretion, in good faith, and without fraud, and made for the actual or supposed advantage of the association. In such case there is no criminal responsibility, although the transaction result in loss and damage to the bank. But if such loans or discounts or overdrafts are made or permitted in bad faith, for the purpose of personal gain, or for private advantage of the officers, and not, therefore, in the honest exercise of official discretion, they do not give the consent of the bank, and the defendant would not be protected by such authority so given, if he was a party to such arrangement. If fraudulent credits were given upon the books of the bank, either to the defendant, or to other persons acting for him, neither he nor they acquired thereby any right to the funds represented by such credits. A credit upon the books of the bank, to be valid and create the relation of creditor and debtor between the parties having such credits and the bank, must represent value received by the bank in the shape of actual cash, or what is honestly deemed its equivalent. It must represent bona fide indebtedness. The authority of the directors and of the officers and com-

mittees of the bank extends only to legitimate transactions intended for the benefit of the bank; and, if you find that any such arrangement or agreement was made, you must consider with whom and under what circumstances it was made, and whether in good faith, and for the actual or supposed benefit of the bank. The defendant has testified. that he had authority to make overdrafts from the board of directors at the time of the transactions charged in the indictment. He admits that nothing appears of record on the minutes of the board authorizing this. In his statement he is contradicted by Mr. Rawls, one member of the board, and the only one, so far as the evidence discloses, of those who were directors in the last years of the bank's history, who paid his liabilities to the bank. As to the other directors, Messrs. Penland and Dickerson, the collateral evidence introduced in this case shows that they also largely overdrew their own personal accounts; and I invite you to consider these circumstances in determining whether or not such arrangement or agreement, if you shall find it was made at all, was entered into honestly and bona fide as official action for the actual or supposed benefit of the bank, or whether, on the contrary, it was an agreement intended for the mutual personal advantage of the directors of the bank, or some of them. If the former, it conferred valid authority; if the latter, it conferred no authority whatever, and funds withdrawn thereunder would be wrongfully withdrawn. Every act of fraud, every known departure from duty by the board in connivance with the president for the plain purpose of sacrificing the interest of the stockholders of the bank, would be an excess of power, from its illegality, and, as such, void as an authority to protect the president in his wrongful compliance.

I am further asked to charge you in No. 33 as follows:

"No other abstraction or willful misapplication of the moneys and funds of the bank by the defendant, than those charged in the bill of indictment against him, will authorize or warrant the jury in convicting the defendant on these charges. If the jury should become satisfied beyond all reasonable doubt that the defendant had on one or many occasions abstracted or willfully misapplied the moneys and funds of the bank, with intent to injure and defraud the bank, but not on the occasions and at the times charged in the bill of indictment, this would not justify a verdict of guilty in this case. In this case the jury must find and be satisfied beyond all reasonable doubt, and from the evidence alone, that the defendant abstracted or willfully misapplied the moneys and funds of the bank, as charged in the bill of indictment, and in the way and manner and at the time or times therein charged, or they will return a verdict of not guilty on these charges."

I am also asked to instruct you in No. 38 as follows:

"The mere drawing of a check creating an overdraft, standing alone, is not a fraud on the part of the drawer, and its payment by the bank officers does not, alone, constitute a fraudulent abstraction or willful misapplication of the funds of the bank."

I give you this in connection with what I have just stated about the authority of the directors and president, and the manner and way in which the act is done.

I am asked in No. 41 to charge you with reference to the question of good character. I cannot give you the instruction asked in the

language of the prayer of the defendant, but I do charge you that a good character proven in a case is evidence in favor of him who possesses it. It goes to augment the presumption of innocence which the law raises in behalf of a defendant, and it must be manifest that the man who, while presumed to be innocent, and therefore presumed to have an ordinarily good character, strengthens that character by the testimony of persons residing in the vicinity in which he lives, produces such evidence as should tend to strengthen the presumption of his innocence, just as, if he had undertaken to introduce such evidence, and had failed—in other words, if his witnesses had proven him a bad character—it would tend to detract from that presumption of innocence which the law indulges in favor of every defendant; and to that extent it is proper and competent evidence, and is to be considered by the jury along with this presumption of innocence, and along with the other evidence in the case.

And this brings me to refer to your rights and duties in respect to the testimony of the witnesses introduced before you. You have a right to consider their bearing and demeanor on the stand; their interest, if any, in the result of the suit; the inherent probability or improbability of their evidence; its self-contradictions, if any, etc. Since the passage of the act of March 16, 1878, c. 37, 20 Stat. 30 [U. S. Comp. St. 1901, p. 660], a defendant in a criminal case in the courts of the United States may, "at his own request, but not otherwise," be introduced as a witness in his own behalf. His failure to embrace the privilege, in the words of the statute, "shall not create any presumption against him," and this has been held by the Supreme Court of the United States to forbid all comment in the presence of the jury upon his omission to testify. Wilson v. United States, 149 U. S. 60, 13 Sup. Ct. 765, 37 L. Ed. 650. But on the other hand, if he does avail himself of the privilege, he is entitled to all the rights, and subject to all the criticisms, of a witness in general. The defendant here has availed himself of that privilege, and, in considering his evidence, you have a right to look to his testimony in the light of the considerations suggested. In weighing his evidence, and determining how far it is credible, you have a right to consider his deep personal interest in the result of the trial, as well as his manner and demeanor on the witness stand, the inherent probability or improbability of his evidence, and, in short, to weigh his evidence just as you would that of any other witness having an equally strong personal interest. If his evidence, or that of any other witness, is self-contradictory, you have a right to consider that in determining what credit, if any, you will give to it.

Now, gentlemen, as to the facts in the case, I desire simply to refer in the most general way to the contentions of both sides. You have heard all of the evidence, and are doubtless more familiar with it than I am. This evidence has been elaborately argued by most able counsel on both sides, and that will refresh your memory if you have forgotten any points of the testimony.

The government contends that the acts charged in the indictment

were committed by the defendant without the bona fide knowledge and consent of the bank, with full knowledge on his part of a desperate condition in his own finances and those of the bank, and with the intent to injure and defraud the bank and other persons. For the purpose of showing such knowledge and intent on his part, it has introduced evidence tending to show: That the defendant, who came to Asheville in 1885 and organized this bank, and who, it is admitted, at all times thereafter, until its failure, was its president and a director, bought and paid for $5,000 of its capital stock, and that at that time there is no evidence that he had other property. That the defendant thereafter bought property of various kinds, including real estate, additional bank stock, and some smaller blocks of stock in several companies in the vicinity of Asheville, and that the money to pay for these purchases was obtained from the First National Bank of Asheville. That only a portion of the money so obtained was obtained by him upon notes upon which he was nominally bound, and that, beginning not later than 1891, he began to obtain credits by the discount of notes of accommodation makers, some of whom were then insolvent, and that, of such accommodation makers as were then solvent and remained solvent, none remained bound to the bank in 1897, when it failed; all notes signed by such men having, it is contended, been replaced by the notes of men having no financial responsibility. That, notwithstanding he was obtaining this large line of credit upon these accommodation notes, and upon other notes signed and indorsed by himself, his account in the bank was frequently overdrawn for large sums—so large that the Comptroller of the Currency was constantly calling upon the directors to reduce these overdrafts. In addition to this, that his loans upon which he was maker or indorser during much of the time exceeded the limit fixed for the loans to any one person, namely, 10 per cent. of the capital stock of the bank. That if he had appeared as maker or indorser upon these notes, of which he admits he got the benefit in loans and credits from the bank, his account would have shown, as early as January, 1894, that he had borrowed over $80,000, or eight-tenths of the capital stock of the bank. That Penland, a co-director and the cashier of the bank, had at that time obtained credit in a similar manner to the extent of $60,000, and that Dickerson, another director, had obtained $30,000, or a total to these three directors of $170,000, in January, 1894, or 1.7 times the entire capital of the bank. That at the date of the failure of the bank these amounts had been increased largely, so that the defendant then owed the bank something like $114,000, Penland about $81,000, and Dickerson about $60,000, or a total of about $255,000, besides two $10,000 notes owed by Breese and Penland jointly as balance of the purchase money on the purchase of the bank building, or, in all, these three directors then owed the bank something like $275,000, or nearly 2.8 times its entire capital stock.

It is contended by the government that the bank neither knew of nor authorized these credits, and they introduced Mr. R. R. Rawls, one of the directors, who testified that he only knew of the

loans shown by the reports to the Comptroller of the Currency, and neither knew of, nor consented to, the credits made up of the Leonard, Kemp, and similar notes. It is further contended by the government that the defendant made false and misleading reports and statements to the Comptroller of the Currency in various particulars; reporting in one instance no overdrafts against himself, when in fact he was overdrawn to the extent of $2,844, and failing constantly to show that he was indorser or guarantor or payor of this large sum represented by the Leonard and other similar notes, of which he admits he got the benefit, and for which he claims and admits he had guarantied the payment to the bank.

It is further contended that he caused a false entry to be made upon the books of the bank, creating a false credit in favor of the bank of about $1,353, and a false charge against the Carolina Savings Bank of the same amount, for the purpose of deceiving the bank examiner, who arrived unexpectedly. You will recall and consider the evidence in that regard. It is claimed that, without authority, he signed the name of W. W. Rollins to two notes, for $1,000 each, dated April 6, 1897, and sent them to other banks in renewal of other notes theretofore in such banks, and which had fallen due. This contention, I understand it, is admitted by the defendant, who claims to have afterwards communicated the facts to and received from Maj. Rollins a ratification of his act. This is denied by Maj. Rollins, who says he never knew anything of the transaction until he saw the notes at this trial, and who says that, when he saw these notes at a former trial, he knew they were not signed by him, but supposed they were copies of notes of his own signing, although he had never, to his knowledge, signed notes to exceed $7,000, in the aggregate. And I call your attention to the fact that even the defendant does not claim that he ever communicated these facts to the bank, or to the other banks in which these notes were rediscounted.

The government also contends that the defendant made a false statement to Col. Burgwyn, bank examiner, in June, 1897, a short time before the failure of the bank, as to the financial condition and responsibility of Kemp, the colored driver of the defendant. You will recall the evidence as to this. It is further contended by the prosecution that the defendant received a good and valuable credit through the Purefoy transaction of $3,000, and that when Dr. Purefoy withdrew the money loaned, by means of his check, he was suffered to appear as having overdrawn his account for a time; the apparent overdraft being eventually covered by a note of no value.

All of these and similar transactions were introduced by the government merely for the purpose of showing knowledge and intent, and, of course, have no other bearing upon the charge in the indictment.

There is a transaction, however, which it is contended by the government has a somewhat closer relation to the offenses charged in the indictment. It is contended, and not denied, that in the month of July, when the bank was tottering to its fall, collections aggregating about $17,000 were made by the First National Bank

131 F.—59

of Asheville for other banks, and that the funds so collected were deposited in the bank by the bank's collector, and checks were drawn by him upon the Chemical National Bank of New York in settlement thereof, and signed by the defendant as president, but, by direction of defendant, these checks were not sent out, but were withheld until after the bank closed its doors. According to the testimony in the case, a number of the checks of the defendant were paid out of funds in the bank after the time when these remittance checks were drawn and withheld, and the prosecution contends that the defendant knowingly withdrew to that extent this money, which honesty and good faith required should be applied to these remittances, leaving the bank, to that extent, indebted to these other banks for moneys belonging to such banks, and which the First National Bank of Asheville had received, and which the defendant had wrongfully embezzled, abstracted, and misapplied, with intent to injure and defraud. The defendant contends that in all of these various transactions he acted honestly and in good faith; that he believed himself to be, and knew that he was, solvent and able to pay his debts. You will recall his testimony. He admits that all the time, since 1894 at least, his obligations to the bank were growing by leaps and bounds, and that in face of the fact that during the period from January 1, 1894, to January, 1897, inclusive, the dividends from his bank stock credited to his account amounted to $11,500 and over, and his salary to over $6,000 more. Notwithstanding these facts, he was putting in bank more and more of these notes of Leonard, Kemp, etc., to pay interest, and interest on interest. He explains the necessity of the increase of the Rollins notes from $7,000, the original amount for which he agreed in 1892 to save Maj. Rollins harmless, to $9,400, the amount when the bank failed, by a calculation showing that the accrued interest on these notes would have increased them to the latter figure, and avowed his inability to pay this interest as the reason for having taken the liberty of signing Maj. Rollins' name to the two $1,000 notes on April 6, 1897. Gentlemen, it is for you to consider whether such a state of financial paralysis is consistent with his statement of an absolute solvency on his part, or his belief in it. Indeed, in his testimony the defendant has tried to make it appear that after January, 1894, he obtained no actual money from the bank, and that the increase of his obligations to it from $80,800 to $114,000 arose solely from accumulations of interest which he was unable to pay. The government, on the other hand, contends that he never ceased drawing money from the crippled bank by check until July 21, 1897, the date of the last transaction charged in the indictment.

I have neither the time nor the inclination, gentlemen, to refer further to the evidence in this case. The facts and the contentions have been fully and ably argued before you by the learned counsel on both sides. It is now to be submitted to your honest, conscientious consideration as sworn jurors of the United States court for this district.

One word more, and I have done: When you have retired to your room and considered of your verdict, and have taken your

ballot, it may be that you will not view the evidence alike; that its effect upon the minds of a portion of you may be weaker or stronger than upon the minds of the remainder. In that event, I would say to those of you who may find yourselves in the minority you should not too hastily conclude that your brethren are wrong, and you alone right. If you of the minority are for conviction, you should ask yourselves, "Is the evidence of guilt which fails to convince a majority of my brethren of the guilt of the accused beyond a reasonable doubt in truth so strong as I thought it was?" If you are for acquittal, you should inquire of your own heart and mind, "Is the doubt in my mind, and which fails to appeal to the reason of my brethren, indeed a reasonable doubt, or is it founded upon some prejudice, or induced by a desire of avoiding the responsibility of decision?" Ask yourselves these questions, talk the matter over with your brethren, with a view of arriving at a true and just conclusion, and you will be in a fitting frame of mind to reach it.

A word as to the form of your verdict: If you should find the defendant not guilty upon all the charges against him, you will return a general verdict to that effect. If you should find him not guilty upon all of the counts for embezzlement, but guilty upon one or more counts for abstraction and willful misapplication, your verdict should be, "We, the jury, find the defendant not guilty of embezzlement, as charged in the within indictment, but we do find him guilty of abstraction and willful misapplication, as therein charged." If you should find that he is guilty upon one or more of the counts for each of the offenses of embezzlement, abstraction, and willful misapplication, you may find a general verdict of guilty.

I now dismiss you to your room with a solemn adjuration to do your duty as you see it, without prejudice, without favor, and without fear.